IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| TERRY FERGUSON, | ) | |
| Plaintiff, | ) | Civil Action No. 7:15cv00140 |
| | ) | |
| v. | ) | |
| | ) | |
| C.L. MESSER, *et al.*, | ) | By: Elizabeth K. Dillon |
| Defendants. | ) | United States District Judge |

**MEMORANDUM OPINION**

Terry Ferguson, a Virginia inmate proceeding *pro se*, filed a civil rights action pursuant
to 42 U.S.C. § 1983, alleging that the defendants subjected him to cruel and unusual living
conditions, used excessive force against him, denied him due process, verbally abused him,
denied him medical treatment, and retaliated against him. Defendants filed a motion for
summary judgment, and Ferguson responded, making this matter ripe for disposition. Having
considered the record, the court will deny in part and grant in part defendants' motion.

I.  BACKGROUND

Ferguson alleges that on May 26, 2013, while housed at Red Onion State Prison (Red
Onion), he was moved to a cell with no running water. He states that he told defendant Officers
Arnold and Stallard about it and they told him that they would see what they could do.
Thereafter, Ferguson told several other officers as the shifts changed, but "nothing was ever done
to redress the matter," leaving him "in the cell with no water, thirsty and confused." Ferguson
remained in the cell for two weeks with no water in his sink. During that time, Ferguson could
not wash his hands after using the bathroom, was "forced to consume his meals with unclean
hands," was "forced to perform his prayer rituals without performing the required ablutions prior
to prayer," was "unable to brush his teeth or wash his face," and was "forced to drink water from

the toilet just to prevent dehydration." Ferguson states that he "experienced fatigue, dry mouth, headaches, and abdominal pains and nausea as a result of insufficient water intake and from the consumption of toilet water." (Am. Compl. ¶¶ 14–24, Dkt. No. 59-1.)

On June 4, 2013, Ferguson complained to defendant Officers Messer and Bryant about the inoperable sink while they were delivering his meal, and they "ignor[ed]" his "plea" and closed his tray slot before giving him milk or juice. When Ferguson told Bryant that he did not get his milk and juice, Bryant squeezed the milk and told Ferguson that if he continued "bitching," Bryant would squeeze Ferguson's "balls" and would "squeeze juice into Ferguson's asshole to remind [him] of someone pissing on his brown eye." Ferguson requested to speak with a supervisor, and Bryant and Messer "laughed." In response, Ferguson put his arm in the tray slot "to obstruct the officer[s] from securing it" so that they would have to notify their supervisor. Messer refused to call a supervisor, and Messer and Bryant left Ferguson's cell with the tray slot unsecured. Messer and Bryant later returned to Ferguson's cell and, "without warning," Messer began to "vehemently spray [Ferguson] with a long blast of gas hitting him in the face, eyes, mouth, neck, etc, while he and Bryant simultaneously wrestled with [Ferguson's] arm until they were able to force it into the tray slot." After the tray slot was secured, the officers left Ferguson's cell. Ferguson began to "scream and yell" to the officers for medical care or decontamination. Messer replied, "Use your water bitch! Oh, I forgot you don't have any, so stick your head in the toilet." For hours, the gas made Ferguson feel "as if he were on fire," caused temporary blindness, and left him gasping for air, coughing, and vomiting. Messer and Bryant ignored his pleas for help. Ferguson alleges that he did not receive medical care or decontamination after being sprayed with the "chemical." (Am. Compl. ¶¶ 27–44.)

2

Later that evening, Bryant came to Ferguson's cell with a dinner tray, looked in the cell, stated, "You're not eating bitch," and left with the tray. At the end of his shift, Messer looked at Ferguson's cell and yelled, "Ferguson, you are going to have a long weekend." (*Id.* ¶¶ 45–46.)

On June 7, 2013, Messer returned to duty. Officers Sluss and Arnold deprived Ferguson of breakfast. Messer and Bryant denied Ferguson lunch and dinner. That evening, Ferguson was served a Disciplinary Offense Report that charged him with threatening bodily harm against Sluss at breakfast time earlier that day. Ferguson states that he "never uttered a word to Officer Sluss while he was serving breakfast meals, except when he responded [affirmatively] to the officer's question" about whether Ferguson wanted breakfast. Ferguson asserts that the report was fabricated by Sluss "in an attempt to cover up his misconduct of depriving [Ferguson] his breakfast meal." (*Id.* ¶¶ 47–56.)

On June 8, 2013, Officers Bryant, Messer, and Burke denied Ferguson breakfast. Messer and Bryant denied Ferguson lunch. Ferguson alleges that Messer placed an empty tray in Ferguson's tray slot so that, to the cameras, it would look like he gave Ferguson a meal, thereby allowing Messer to "circumvent prison policy of having to notify the Mental Health department and other authorities of a potential hunger strike . . . ." After mealtime, Messer and Bryant left the empty tray in Ferguson's cell. Messer and Bryant denied Ferguson dinner that evening. After the shift change, Ferguson was served with another Disciplinary Offense Report written by Messer for disobeying an order, alleging that Ferguson refused to return his tray. Ferguson asserts that the report was fabricated "in an attempt to cover up [Messer's] misconduct of depriving [Ferguson] his meals." (*Id.* ¶¶ 57–68.)

On June 9, 2013, Messer and Bryant denied Ferguson breakfast. When Messer walked by Ferguson's cell door, Ferguson told him that he wanted his meal, but Messer told Ferguson, "I

told you until you answer to Sunshine, you will never eat on my watch."  Messer, Bryant, and Sluss denied Ferguson lunch.  After they had served the other inmates' meals, Messer, Bryant, and Sluss "gathered around [Ferguson's] cell door and began to tease and antagonize him about not eating."  Messer also said, "Do you see what I'm doing? I will never feed you bitch, and I will keep marking on your chart that you're refusing to eat as I keep writing you charges to justify me not accessing your tray slot to feed you."  Thereafter, Sluss turned Ferguson's toilet off "for no reason."  Bryant and Arnold denied Ferguson dinner.  Arnold stood at Ferguson's cell and asked, "You hungry bitch?"  While Bryant was collecting trays from the other cells, he passed Ferguson's cell and said "I bet you know not to fuck with us again."  (*Id.* ¶¶ 69–79.)

Ferguson alleges that while he was denied meals for three consecutive days, he experienced "hunger pangs, fatigue, and headaches; his stomach seemed topsy-turvey, he had cramps and diarrhea; his cheeks appeared hollow, his eyes appeared to be sunken in, he had no energy, he was unable to perform daily physical and mental activities, he experienced severe weight loss, his body temperature dropped, and his body seemed to be shutting down."  Ferguson states that each day that he was denied meals, he "repeatedly pleaded to the officers to be fed," but was nevertheless denied meals.  Ferguson alleges that he was "forced to drink water from the toilet bowl to prevent dehydration" on the three days that he was denied meals.  (*Id.* ¶¶ 80–83.)

Ferguson received another Disciplinary Offense Report for "threaten[ing] to commit/killing or attempting to kill any person" on June 9, 2013, reported by Messer.  Ferguson alleges that Messer fabricated the report "in an attempt to cover his misconduct of depriving" Ferguson of meals.  (*Id.* ¶¶ 84–86.)

That same day, after the shift change, Officer Williams entered the "chase closet" to turn on Ferguson's toilet. Williams also was able to reconnect Ferguson's water line to give him running water in his sink. (*Id.* ¶ 87.)

Thereafter, Ferguson "retrieved the telephone and called the Virginia Sexual Assault/Sexual Harassment Hotline and reported Messer's and Bryant's sexual harassment and their attempt to kill [Ferguson] via starvation and dehydration." On June 11, 2013, Ferguson spoke with an investigator concerning the telephone call and provided a written statement detailing everything that had happened. The investigator told Ferguson that an investigation would be conducted. (*Id.* ¶¶ 88–91.)

On June 13, 2013, Ferguson attended the disciplinary hearing for the "fabricated" charges written by Messer and Sluss. Counselor Mullins acted as Ferguson's staff representative. Prior to the hearings, Mullins told Ferguson that it is "not her job to be his advocate or to help him with the preparation of defense strategies." Sluss and Burke "forced" Ferguson to wear a spit mask to the hearing per the orders of Unit Manger (UM) Younce. Ferguson "acquiesced" to wearing the spit mask, despite believing that it was "unwarranted." Ferguson was also "forced to sit with his back toward the entire disciplinary proceeding" per the orders of UM Younce. Disciplinary Hearing Officer (DHO) Counts "stood by and allowed [UM Younce] to enact the arbitrary practice." Ferguson argues that he was denied due process at the hearing because he was denied witnesses, evidence, and the opportunity to present rebuttal testimony; his participation was "hindered" by the spit mask; and his staff representative, Counselor Mullins, did not help him. He also contends that the spit mask and his "seating arrangement" were done in retaliation for him "reporting Officers Messer and Bryant's misconduct to the prison investigator and to the . . . hotline." He was found guilty and penalized with a twelve dollar fine

for each of two charges and a 30-day period of administrative segregation for the third. (*Id.* ¶¶ 92–157.)

After his hearing, Sluss and Burke escorted Ferguson back to his cell and "subjected [him] to a torrent of racial epithets and verbal abuse." Later that evening, Ferguson received another Disciplinary Offense Report written by Sluss for "threatening to commit/killing or attempting to kill any person." Ferguson asserts that the report was fabricated in retaliation for Ferguson reporting "Sluss and his coworkers' misconduct" to the prisoner investigator and hotline. Ferguson alleges that, "under duress," he accepted a penalty offer on the charge. DHO Counts signed the written disposition, and Deputy Warden Mathena and Regional Administrator Hinkle upheld the decision on appeal. Ferguson maintains his innocence of the disciplinary conviction. (*Id.* ¶¶ 158–68.)

On July 10, 2013, Sergeant Dickerson and Sluss removed Ferguson from his cell "under the pretense" that they were checking to see if his sink and toilet were functioning properly, despite Ferguson demonstrating to them that they were. Sluss escorted Ferguson to a temporary cell and, on the way, told him that they were "going to teach [Ferguson] a lesson since he like[d] calling the sexual assault/sexual harassment hotline." About ten to fifteen minutes after Ferguson arrived at the cell, Sgt. Dickerson arrived, instructed Ferguson to remove his clothes, and told Ferguson he would be given a "full body search." After the search, Sgt. Dickerson gave Ferguson back only his underwear. Sgt. Dickerson, Lieutenant A. Mullins, and Messer then escorted Ferguson, who was wearing only underwear, to a "security strip[] cell," where he stayed for twenty-four hours. Ferguson states that he "was never told the reason(s) he'd been placed under such condition of confinement or who had authorized the strip[] cell status." Ferguson alleges that he had no mattress, no bedding, no clothing, and no toiletries; the cell "reeked of

6

feces, urine, and vomit"; the cell walls "were covered in bodily excretions"; the cell was extremely cold; and there was a "foul stench exuding from the ventilation." Ferguson "repeatedly" asked to be removed from "such vile conditions," but his "pleas were routinely ignored." (*Id.* ¶¶ 169–83.)

Moments after being placed in the cell, Officer Dupuie placed "some papers" in the door handle and left. Ferguson asked to see the papers, but was told that he could not have them while on strip cell status. (*Id.* ¶¶ 184–85.)

Ferguson alleges that while in the strip cell, his food was served on a styrofoam tray and without utensils. Because he had no soap, he "had to consume the little food that he could stomach, with dirty, foul hands." Around 1:00 am, Ferguson received a mattress, but no sheets or blankets. Ferguson alleges that "the temperature of the cell became unbearable to the point that he was forced to get inside of the mattress to keep from freezing." At breakfast, Ferguson "was forced to eat . . . with his unclean[] hands and fingers." Ferguson contends that during his time in the strip cell, he was "unable to perform his prayer rituals since he could not complete the ablutions that precede his prayer." That evening, Ferguson was removed from strip cell status. (*Id.* ¶¶ 187–99.)

Ferguson received the papers that Dupuie had left in his door the previous day and discovered that he had received two Disciplinary Offense Reports, both written by Sgt. Dickerson, for possessing a weapon or sharpened instrument and for intentionally destroying or altering state property.[1] Ferguson alleges that he was denied due process with regard to these charges because they were never properly served on him and he was not given the opportunity to

---

[1] Dickerson alleged that while he was in Ferguson's cell, he discovered that the intercom was loose and that when he touched it, it fell into his hand and he saw that the screw on the intercom had been sharpened to a point.

present evidence or request staff assistance or witnesses. Ferguson asserts that the reports were written in retaliation for Ferguson calling the hotline. (*Id.* ¶¶ 201–10.)

On July 16, 2013, Sgt. Dickerson and Officer Powers took Ferguson to the disciplinary hearing on the two charges. Ferguson explained to DHO Counts that he had not been properly served with the Disciplinary Offense Reports and that he had never been given a penalty offer. DHO Counts then offered him a twelve dollar fine, and Ferguson declined the penalty offer. DHO Counts adjourned the hearing and had Ferguson escorted back to his cell. Ferguson claims that DHO Counts "railed him with obscenities" as he was leaving. (*Id.* ¶¶ 211–19.)

When Ferguson arrived back at his cell after the hearing, Sgt. Dickerson entered the cell and removed the mattress because it allegedly "had been altered." When Ferguson asked if he would receive another mattress, Sgt. Dickerson "looked at [Ferguson] and smiled." "Later that evening," Ferguson told Lt. A. Mullins and UM Younce that he had no mattress, and they did not move him to a different cell or give him a mattress. Ferguson contends that he was forced to sleep on a metal bed frame for two consecutive nights, "causing him to suffer neck and back injuries," for which he is "still undergoing medical treatment." (*Id.* ¶¶ 220–31.)

On July 19, 2013, Lt. A. Mullins came to Ferguson's cell regarding the previously-adjourned disciplinary hearing for intentionally destroying or altering state property. Lt. A. Mullins offered Ferguson loss of telephone privileges as a penalty, and Ferguson declined. Lt. A. Mullins refused to take Ferguson to the hearing because "they were short of staff" and because Ferguson knew that "as soon as he open[ed] his mouth, the hearing officer [would] kick him out." On July 30, 2013, Ferguson learned that he was found guilty in his absence and a twelve dollar fine was imposed. The next day, he learned that he had also been found guilty in his absence for possessing a weapon or sharpened instrument. DHO Counts imposed a penalty

8

of thirty days of disciplinary segregation for that disciplinary conviction. Regional Administrator Hinkle upheld both disciplinary convictions on appeal. (*Id.* ¶¶ 232–44.)

## II. DISCUSSION

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is inappropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). However, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted). In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See id.* at 255; *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

A court must grant a motion for summary judgment if, after adequate time for discovery, the nonmoving party fails to make a showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party cannot defeat a properly supported motion for summary judgment with mere conjecture and speculation. *Glover*

9

*v. Oppleman*, 178 F. Supp. 2d 622, 631 (W.D. Va. 2001) ("Mere speculation by the non-movant cannot create a genuine issue of material fact."). The trial judge has an "affirmative obligation" to "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003).

## B.  Living Conditions Claims

Ferguson alleges that he was subjected to cruel and unusual living conditions. Defendants argue that Ferguson's claim concerning running water is unexhausted; that defendants did not maliciously withhold food trays and Ferguson did not suffer sufficient injury from being denied meals for three days; that defendants did not maliciously place him in the strip cell status and Ferguson suffered no injury as a result of the conditions; and that defendants only negligently failed to give him a mattress, if they did not give him one. Having reviewed the record, the court finds that genuine disputes of material facts preclude summary judgment and, therefore, denies defendants' motion as to these claims.

### 1.  Exhaustion of the water claim

Defendants argue that Ferguson failed to exhaust administrative remedies as to his claim that he was denied running water for two weeks. The court finds a material dispute as to whether administrative remedies were available to Ferguson and, therefore, will deny summary judgment on this ground.

VDOC Operating Procedure § 866.1, Offender Grievance Procedure, is the mechanism used to resolve inmate complaints and requires that, before submitting a formal grievance, the inmate must demonstrate that he has made a good faith effort to resolve the grievance informally through the procedures available at the institution to secure institutional services or resolve complaints.

If the informal resolution effort fails, the inmate must initiate a regular grievance by filling out the standard "Regular Grievance" form. Generally, a Regular Grievance must be submitted within thirty calendar days from the date of the incident. An exception to this time requirement is in instances "beyond the offender's control."

Prior to review of the substance of a grievance, prison officials conduct an "intake" review of the grievance to assure that it meets the published criteria for acceptance. A grievance that meets the criteria for acceptance is logged in on the day it is received.[2] If the grievance does not meet the criteria for acceptance, prison officials complete the "Intake" section of the grievance and return the grievance to the inmate. If the inmate desires a review of the intake decision, he must send the grievance form to the Regional Ombudsman.

The Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. 1997e(a). "[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)). "'[T]he language of section 1997e(a) clearly contemplates exhaustion *prior* to the commencement of the action as an indispensible requirement, thus requiring an outright dismissal [of unexhausted claims] rather than issuing continuances so that exhaustion may occur.'" *Carpenter v. Hercules*, No. 3:10-cv-241, 2012 U.S. Dist. LEXIS 72096, at *12, 2012 WL 1895996, at *4 (E.D. Va. May 23, 2012) (quoting *Johnson v. Jones*, 340 F.3d 624, 628 (8th Cir. 2003)). The exhaustion requirement

---

[2] Up to three levels of review for a regular grievance exist. The Facility Unit Head of the facility in which the offender is confined is responsible for Level I review. If the offender is dissatisfied with the determination at Level I, he may appeal the decision to Level II, a review which is conducted by the Regional Administrator, the Health Services Director, or the Chief of Operations for Offender Management Services. The Level II response informs the offender whether he may pursue an appeal to Level III.

11

"allow[s] a prison to address complaints about the program it administers before being subjected to suit, reduc[es] litigation to the extent complaints are satisfactorily resolved, and improv[es] litigation that does occur by leading to the preparation of a useful record." *Jones*, 549 U.S. at 219. Failure to exhaust all levels of administrative review is not proper exhaustion and will bar an inmate's § 1983 action. *Woodford v. Ngo*, 548 U.S. 81, 88–89 (2006).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d 717, 725, 729 (4th Cir. 2008); *see Langford v. Couch*, 50 F. Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he second PLRA amendment made clear that exhaustion is now mandatory."). But the court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). An inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). An administrative remedy is not available "if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d at 725.

In response to the motion for summary judgment, Ferguson states that on May 26, 2013, the day he was placed in the cell with no running water, he spoke to the night-shift supervisor and requested an informal complaint form. Ferguson was told that informal complaints "are not passed out by the night shift." The following day, he attempted to obtain an informal complaint from the day-shift supervisor, but was told that no forms were available. After two unsuccessful attempts to obtain an informal complaint, Ferguson alleges that he filed a regular grievance concerning the lack of water in his cell. In the grievance, he also explained that he could not obtain an informal complaint despite his efforts. After receiving no response within the allotted timeframe, Ferguson wrote to the Grievance Coordinator inquiring about the disposition of his

12

grievance. Ferguson was informed that his grievance had not been received by the Grievance Department. Ferguson alleges that he then "repeatedly attempted to obtain an informal complaint from every supervisor that entered the housing unit, and on every occasion, [he] was either told that there [were] no informal complaints available or that they would bring [] one back to him[, but] they never did." Ferguson states that he received an informal complaint on July 8, 2013, and he filed it, complaining about the lack of water in his cell. Dissatisfied with the response, Ferguson filed a regular grievance, which was rejected as untimely filed. Ferguson appealed, and the intake decision was upheld. (Pl.'s Aff. Opp'n to Defs.' Mot. Summ. J. (Pl.'s Opp'n) ¶¶ 22–32.) Based on the record before the court and drawing all reasonable inferences in the light most favorable to Ferguson, the court concludes that there is a material dispute as to whether administrative remedies were available to Ferguson. Accordingly, the court will deny defendants' motion for summary judgment on this ground.

### 2. Merits of other living conditions claims

Ferguson also alleges that he was denied food and drinks for three consecutive days, placed in a strip cell for twenty-four hours, and denied a mattress for two consecutive days. The court finds genuine disputes of material facts preclude summary judgment and, therefore, will deny defendants' motion as to these claims.

To establish that living conditions constitute cruel and unusual punishment, a prisoner must prove (1) that "the deprivation of the basic human need was objectively sufficiently serious," and (2) that "subjectively the officials acted with a sufficiently culpable state of mind." *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993) (internal quotation marks omitted). Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement. *See, e.g., Hudson v. McMillian*, 503

U.S. 1, 8–9 (1992).  In order to demonstrate such an extreme deprivation, a prisoner must allege "a serious or significant physical or emotional injury resulting from the challenged conditions," *Strickler*, 989 F.2d at 1381, or demonstrate a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions, *Helling v. McKinney*, 509 U.S. 25, 33–35 (1993).  The subjective component of an Eighth Amendment claim challenging the conditions of confinement is satisfied by a showing of deliberate indifference by prison officials.  *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  "Deliberate indifference entails something more than mere negligence . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835.  It requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm.  *See id.* at 837; *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).

### a. Meals

Ferguson alleges that he was denied all meals and drinks for three consecutive days while defendants made statements such as: "You're not eating bitch"; "Until you answer to Sunshine, you will never eat on my watch"; "You hungry bitch?"; and "I bet you know not to fuck with us again."  He also alleges that as a result of being denied food and drinks (while having no running water in his cell) for three days, he was "forced to drink water from the toilet bowl to prevent dehydration" and he experienced "hunger pangs, fatigue, and headaches; his stomach seemed topsy-turvey, he had cramps and diarrhea; his cheeks appeared hollow, his eyes appeared to be sunken in, he had no energy, he was unable to perform daily physical and mental activities, he experienced severe weight loss, his body temperature dropped, and his body seemed to be shutting down."  Defendants assert that they did not maliciously withhold food trays and that Ferguson did not suffer sufficient injury.  Based on the record before the court and drawing all

14

reasonable inferences in the light most favorable to Ferguson, the court concludes that genuine disputes of material facts preclude summary judgment and, therefore, will deny defendants' motion.

### b. Strip Cell

Ferguson alleges that he was placed in a strip cell for twenty-four hours after being told that defendants were "going to teach [him] a lesson since he like[d] calling the sexual assault/sexual harassment hotline." Ferguson alleges that in the strip cell, he had no mattress until the middle of the night, no bedding, no clothing, and no toiletries; the cell "reeked of feces, urine, and vomit"; the cell walls "were covered in bodily excretions"; the cell was extremely cold; and there was a "foul stench exuding from the ventilation." Ferguson also alleges that "the temperature of the cell became unbearable to the point that he was forced to get inside of the mattress to keep from freezing." Ferguson claims that he repeatedly asked to be removed from the "vile" cell, to no avail. Defendants assert that they did not maliciously place him in the strip cell and that he suffered no injury as a result of the conditions. Based on the record before the court and drawing all reasonable inferences in the light most favorable to Ferguson, the court finds that there are genuine disputes of material facts as to whether Ferguson faced a substantial risk of such serious harm resulting from his exposure to the challenged conditions. These disputes preclude summary judgment; thus, the court will deny defendants' motion as to this claim.

### c. Mattress

Ferguson alleges that on July 16, 2013, when he was placed in a cell, Sgt. Dickerson removed his mattress because it had been altered. When Ferguson asked if he would receive another mattress, Sgt. Dickerson "looked at [Ferguson] and smiled." "Later that evening,"

15

Ferguson told Lt. A. Mullins and UM Younce that he had no mattress and they did not move him to a different cell or give him a mattress. Ferguson contends that he was forced to sleep on a metal bed frame for two consecutive days, "causing him to suffer neck and back injuries," for which he is "still undergoing medical treatment." Defendants assert that they do not recall removing the mattress from his cell, but state that, if they did, it would have been because the mattress was ripped or torn. They also state that they would have replaced it if they had taken it away. However, they state that if they did not replace it, it was an oversight attributable to simple negligence. Based on the record before the court and drawing all reasonable inferences in the light most favorable to Ferguson, the court concludes that genuine disputes of material facts preclude summary judgment and, therefore, will deny defendants' motion as to this claim.

## C. Excessive Force

Ferguson alleges that defendant Messer subjected him to excessive force when he sprayed him with Oleoresin Capsicum (OC) spray without warning.[3] Defendant Messer denies using OC spray on Ferguson and argues that, even if he did use it, that use did not qualify as excessive under the circumstances. The court finds that genuine disputes of material facts preclude summary judgment and, therefore, will deny defendants' motion as to this claim.

The Eighth Amendment prohibits prison officials from inflicting unnecessary and wanton pain and suffering on prisoners. *Whitley v. Albers*, 475 U.S. 312, 320 (1986). To resolve a claim that prison staff's excessive force violated the Eighth Amendment, the court must determine whether the force applied was "in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* at 320–21. Whether the force was necessary or intentionally aimed at inflicting unnecessary physical harm depends on

---

[3] OC spray is a chemical agent similar to what is commonly known as pepper spray or mace and irritates a person's eyes, throat, and nose. *See, e.g., Park v. Shiflett*, 250 F.3d 843, 849 (4th Cir. 2001) (describing the physiological effects of OC spray).

16

factors such as the need for the application of force, the relationship between the need and the amount of force used, the extent of injury inflicted, the extent of the threat to the safety of staff and inmates reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. *Id.* at 321; *see, e.g., Wilkins v. Gaddy*, 559 U.S. 34 (2010).

Ferguson alleges that Messer "vehemently" used OC spray on him without warning. Ferguson contends that Messer sprayed a "long blast of gas" in his face, eyes, mouth, and neck. Messer denies that he used the OC spray and that, alternatively, the use of OC spray was not excessive. Based on the record before the court and drawing all reasonable inferences in the light most favorable to Ferguson, the court concludes that there are genuine disputes of material facts precluding summary judgment on this claim. Accordingly, the court will deny defendants' motion for summary judgment as to this claim.

**D. Due Process Claims**

Ferguson alleges that he was denied due process at his disciplinary hearings.[4] To establish a violation of procedural due process guaranteed by the Fourteenth Amendment, an inmate must demonstrate a deprivation of "life, liberty, or property" by governmental action, which Ferguson has not done. *Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997). When the punishment does not cause the original sentence to be enhanced, protected interests will generally be limited to "freedom from restraint [that] . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). As a result of Ferguson's five disciplinary convictions, he was

---

[4] Specifically, he alleges that (1) Dupuie falsely claimed that he served Ferguson with the July 10, 2013 disciplinary charges, (2) DHO Counts deprived him of his witnesses and evidence and found him guilty of fabricated charges, (3) Deputy Warden Mathena and Regional Administrator Hinkle violated due process when they upheld his disciplinary convictions, (4) Sgt. Dickerson and Powers violated due process by refusing to bring him to his July 19, 2013 disciplinary hearing, and (5) Counselor Mullins, his staff representative, violated due process by failing to assist him at his disciplinary hearings.

17

sanctioned with three twelve dollar fines and two thirty-day assignments to disciplinary segregation. Ferguson does not allege that these penalties imposed an atypical or significant hardship compared to the ordinary incidents of prison life. *See Henderson v. Virginia*, No. 7:07-cv-266, 2008 U.S. Dist. LEXIS 5230, at *33–34, 2008 WL 204480, at *10 (W.D. Va. Jan. 23, 2008) (holding that a twelve dollar fine did not pose an atypical and significant hardship on the plaintiff in comparison to the ordinary incidents of prison life); *Daye v. Ballard*, Case No. 2:11-cv-00106, 2012 U.S. Dist. LEXIS 38436, at *48, 2012 WL 967084, at *17 (S.D. W. Va. Mar. 2, 2012) (holding that plaintiff's placement in disciplinary segregation for a period of thirty days, without a loss of good time credit, did not create an atypical and significant hardship that would give rise to a liberty interest). Therefore, the court concludes that Ferguson's allegations do not state a due process violation concerning the disciplinary hearings and will, therefore, grant defendants' motion for summary judgment as to these claims.[5]

### E. Verbal Abuse

Ferguson alleges that defendants Sluss, Burke, and UM Counts, at various times, subjected him to verbal abuse and threats. Verbal harassment or verbal abuse by prison officials in and of itself does not state a constitutional deprivation under § 1983. *Henslee v. Lewis*, 153 F. App'x 178, 180 (4th Cir. 2005) (citing *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979)); *Johnson v. Laham*, 9 F.3d 1543 (4th Cir. 1993). The Constitution does not "protect against all intrusions on one's peace of mind." *Pittsley v. Warish*, 927 F.2d 3, 7 (1st Cir. 1991). Verbal harassment or idle threats to an inmate, even if they cause an inmate fear or emotional anxiety, do not constitute an invasion of any identified liberty interest. *Morrison v. Martin*, 755 F. Supp. 683, 687 (E.D.N.C. 1990) (finding that the threatening language of a prison official, even if true,

---

[5] To the extent some of his allegations concerning the disciplinary hearings (for example, his allegations concerning the spit mask) can be construed as claims of retaliation or cruel and unusual punishment, those claims were not addressed by defendants; thus, they survive the current motion for summary judgment.

18

does not amount to constitutional violation); *Keyes v. City of Albany*, 594 F. Supp. 1147 (N.D.N.Y. 1984) ("[T]he use of vile and abusive language [including racial epithets], no matter how abhorrent or reprehensible, cannot form the basis for a § 1983 claim."). Accordingly, the court concludes that Ferguson's allegations of verbal abuse fail to state a cognizable federal claim and, thus, will grant defendants' motion for summary judgment as to these claims.

## F. Supervisory Liability

To the extent Ferguson is attempting to hold Deputy Warden Mathena, UM Younce, or Lt. A. Mullins liable in a supervisory capacity, his allegations fail to state a claim. In order to set forth a claim for supervisory liability under § 1983, a plaintiff must show:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw*, 13 F.3d at 799.

Ferguson has failed to allege facts that would establish the *Shaw* elements against Deputy Warden Mathena, UM Younce, or Lt. A. Mullins. Moreover, government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) (finding no vicarious liability for a municipal "person" under 42 U.S.C. § 1983). Accordingly, the court concludes that Ferguson has failed to state a supervisory liability claim against defendants Deputy Warden Mathena, UM Younce, and Lt. A. Mullins and, therefore, will grant defendants' motion for summary judgment as to these claims.

19

## G. Official Capacity Claims–Damages

To the extent Ferguson brings this action against the defendants in their official capacity for monetary damages, such relief is not available via § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989). Therefore, the court will grant defendants' motion for summary judgment as to Ferguson's claims for monetary damages against defendants in their official capacities.

## H. Unaddressed Claims

Defendants do not address Ferguson's allegations that they failed to decontaminate him or provide him with medical treatment after he was sprayed with OC spray or that they retaliated against him. Additionally, while defendants construed his allegations concerning his placement in the spit mask as an excessive force claim and addressed it under that theory, those allegations are more properly addressed both as part of his retaliation claim and as a claim of cruel and unusual punishment, which defendants have not addressed. In their motion for summary judgment, defendants ask that if they failed to address any of Ferguson's claims, they be given a second opportunity to respond to any of those claims, and the court will grant their request.

## III. CONCLUSION

For the reasons stated herein, defendants' motion for summary judgment is granted in part and denied in part.

An appropriate order will be entered.

Entered: March 30, 2017.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge

20